E-FILED
Friday, 09 September, 2022  09:46:41 AM
Clerk, U.S. District Court, ILCD

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Central District of Illinois

JUL 2 1 2022

CLERK OF COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No. 22-MJ- *7094*
)
SEE ATTACHMENT A )
)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A which is attached hereto and incorporated herein

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B which is attached hereto and incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1341 | Mail Fraud |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344 | Bank Fraud |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/Eric Thomas

*Applicant's signature*

Eric Thomas, Special Agent, Federal Bureau of Investigation

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*

s/Jonathan E. Hawley

*Judge's signature*

Date: ___07/21/2022___

City and state: Peoria, Illinois                Jonathan E. Hawley, United States Magistrate Judge

*Printed name and title*

# A F F I D A V I T

I, Eric Thomas, being first duly sworn, hereby depose and state as follows:

## Introduction And Agent Background

1.      I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises controlled by Google LLC (Google), an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI). I have been so employed since January 2019.  I am currently assigned to a squad in the Champaign Resident Agency of the Springfield Division that investigates a wide variety of federal crimes, including federal crimes relating to white collar crime, including mail, wire, and bank fraud. I am personally involved in an investigation with other federal law enforcement agencies into alleged criminal activities perpetrated by BRETT BARTLETT (hereinafter referred to as "BARTLETT"). The information contained in this Affidavit is

based upon a review of public and private records and other investigative activities conducted by law enforcement personnel assigned to this case.

3.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), and § 1344 (bank fraud) have been committed by BARTLETT.  Specifically, BARTLETT defrauded investors and obtained money from them by making false statements and misrepresentations to them via wire in the form of email and YouTube videos. Additionally, BARTLETT defrauded investors by mailing approximately $8,613,857 worth of insufficient funds checks to a member FDIC financial institution located within the Central District of Illinois.

5.      There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## Jurisdiction

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**Relevant Facts**

7.      At least by 2015, BARTLETT purchased bulk liquidation products, repackaged them, and then resold those products through the internet, including on Amazon. To obtain larger stocks of these bulk liquidation products, BARTLETT sought investors. BARTLETT claimed to have expertise in algorithms used by Amazon that resulted in his products being listed toward the top of Amazon results from online searches. Investors gave money to BARTLETT to purchase specific lots of liquidation product inventory. BARTLETT told the investors that, after those products were sold, the investors would receive a portion of the profit, which would equal around twenty percent of their initial investment.

8.      Through an e-commerce business conference, BARTLETT met an individual, who is now a cooperating witness (hereinafter referred to as "CW"). They became friends and CW eventually moved to the Champaign, Illinois, area. CW was involved with the Vineyard Church of Central Illinois (hereafter referred to as "Vineyard") located in Urbana, Illinois. Around the spring of 2015, BARTLETT and his father-in-law, SCOTT MILLER (hereinafter referred to as "MILLER"), traveled from their residence in California to Urbana, Illinois, and met with potential investors at Vineyard. MILLER claimed to have deep ties to the Vineyard movement, and both MILLER and BARTLETT claimed to share the potential investors' Christian faith. BARTLETT told potential investors about his online marketing expertise and represented that they could expect twenty percent returns from the investments. As a result, approximately sixty investors from Central Illinois invested over $10 million

with BARTLETT, MILLER, and/or their company, 7M E-Group Corp. (created in 2014), over the next several years.

9.      During that time frame, numerous investors established self-directed individual retirement accounts at Bank Champaign in the Central District of Illinois, which they used to invest over $3 million with BARTLETT, MILLER, and/or 7M E-Group.

10.      Despite BARTLETT's representations that the investments would be used to purchase inventory to be sold online, a subsequent financial analysis performed by the FBI of the bank accounts into which these investments were deposited revealed that BARTLETT and/or MILLER used the investments for a variety of purposes unrelated to the purchase of inventory to be sold online. The analysis also revealed that the purchase and sale of inventory that did occur did not always generate the twenty percent or greater rate of return that BARTLETT falsely told his investors they were receiving.

11.      BARTLETT experienced success selling a laser tag toy gun on Amazon around Christmas of 2017. During the summer of 2018, BARTLETT and MILLER created Dynasty Toys, Inc. and sought additional investments in that entity. BARTLETT allowed investors that had inventory accounts with his liquidation product investment business, 7M E-Group, to use their accounts to purchase shares in Dynasty Toys.

12.      From approximately March 2019 through May 2020, BARTLETT made a number of false statements and misrepresentations to investors, who he referred to as his "Dynasty Family," via YouTube video links within the emails he sent from his

e-mail address, investor.dynastytoys@gmail.com. During that same time frame,

BARTLETT also used the e-mail address brettmbartlett@gmail.com to communicate

with investors, and MILLER used the e-mail address scott101159@gmail.com:

    a.    In a March 2019 video, BARTLETT discussed what he called "preferred share conversion," and represented to investors that they would receive a twenty percent annualized return on their initial investment and a twenty percent additional bonus for "conversion," even though such returns were unlikely to occur and did not occur.

    b.    Around October 1, 2019, BARTLETT claimed that another company that he and MILLER had created around the summer of 2018, Concept Management Company, Inc. (CMC), had agreed to purchase Dynasty Toys for $120 million, which was to include a $65 million cash payment, even though all of the entities controlled by BARTLETT and MILLER had only approximately $1 million in cash on hand at the time and CMC had no reasonable expectation of obtaining $65 million in cash to purchase Dynasty Toys. The $120 million purchase never took place.

    c.    In a February 2020 video, BARTLETT represented that CMC would buy back any Dynasty Toys shares at $5 each even though CMC did not have the assets to do so. Moreover, BARTLETT falsely claimed that Dynasty Toys now owned hundreds of millions of dollars in gold assets, when in fact, it did not. Nonetheless, BARTLETT later offered investors the opportunity to invest in gold through CMC and some did so, but BARTLETT did not use their investments to actually purchase gold.

    d.    In one of the YouTube video links within the emails, BARTLETT claimed he was "focused on building and growing community" and with the acquisition of Dynasty by CMC, he was going to move operations and inventory to Illinois, move his family to Illinois, recruit from the University of Illinois Urbana/Champaign and Vineyard, and host conferences at Vineyard or his new offices that he was creating in Illinois. Those events did not occur.

    e.    In a March 2020 video, BARTLETT told investors that he was forecasting sales of $300 million in the next thirty to sixty days, even though that amount of sales were unlikely to occur and did not occur. In the same video, BARTLETT falsely claimed to investors

that Dynasty Toys had one million "members" as of Christmas of
2019 and was valued at $226 million.

13.    In approximately March of 2020, as the COVID-19 pandemic spread

across the United States, BARTLETT created an entity called Family Face Mask and told

investors that their investments were going towards buying and selling face masks. The

email BARTLETT used for this business was familyfacemasks@gmail.com.

14.    In a video around March 27, 2020, BARTLETT told investors – some of

whom were requesting to see Dynasty Toy's financial records – that, because of issues

related to the pandemic, Dynasty Toys was going to buy its stock back from investors

and the checks would be processed in late April of 2020.

15.    On May 15, 2020, a first-class package containing twenty-seven stock

buyback checks, worth a total of approximately $8,613,857, was mailed from Dynasty

Toys, Inc., 4881 Main Street, Yorba Linda, California, to Bank Champaign, 2101 S. Neil

St., Champaign, Illinois, a FDIC member financial institution located in the Central

District of Illinois. This first-class package was paid for with BARTLETT's Stamps

Endicia account. The checks were the stock buyback checks for the individual investors

who invested with BARTLETT through their self-directed IRAs at Bank Champaign. All

of the checks bounced due to insufficient funds.

16.    On May 19, 2020, BARTLETT sent investors an e-mail from

investor.dynastytoys@gmail.com stating, "Please wait to cash your check till we

confirm the correct amount of cash is in the account. If you have already tried to cash it

please hold onto the check until we get this fixed. . . . You will get a follow up email when this has been corrected." On May 21, 2020, BARTLETT sent the investors an e-mail claiming, "we have corrected all checks issues."

17.     Despite BARTLETT's claims, most of the checks received by investors did not clear, nor did they receive a return of their investments. The FBI's subsequent investigation revealed that the Dynasty Toys account on which the checks were written had a balance of approximately $8,382 on May 15, 2020, the date the checks were mailed to Bank Champaign.

18.     On June 8, 2020, BARTLETT and MILLER sent a memorandum to CW and other investors informing them they had hired "professionals" from California as legal counsel and acknowledging "business problems" and the potential need for "some kind of insolvency proceeding." Since that date, BARTLETT and MILLER have had little to no contact with the investors, nor have the investors received a return of their investments.

19.     Around September of 2020, the FBI, with the assistance of other federal agencies, opened an investigation into BARTLETT, MILLER, and their related entities. To date, the investigation has shown that approximately 690 investors, located all over the United States, as well as internationally, lost approximately $23.8 million from their investments with BARTLETT, MILLER, and their related entities. The FBI financial analysis revealed that BARTLETT and MILLER do not have sufficient funds in the accounts they control to repay the investors.

20.     Moreover, the investigation has revealed that during all relevant times

BARTLETT, MILLER, and their related entities failed to keep accurate financial records,

to record minutes of meetings, or to file any tax returns with the Internal Revenue

Service. Thus, any contemporaneous recording of some of their activities related to the

investors and 7M E-Group, Dynasty Toys, and CMC may be limited to the e-mail

communications between BARTLETT, MILLER, their associates, and the investors.

## Probable Cause

21.     As BARTLETT repeatedly communicated to his investors through email

and worked closely with MILLER, there is probable cause to believe that the content of

emails from their accounts: investor.dynastytoys@gmail.com; brettmbartlett@gmail.com;

familyfacemasks@gmail.com; and scott101159@gmail.com contain evidence of violations

of 18 U.S.C. § 1341, 1343, and 1344 committed by BARTLETT, MILLER, and possibly

others.

## Background Concerning Google

22.     Google is a United States company that offers to the public through its

Google Accounts a variety of online services, including email, cloud storage, digital

payments, and productivity applications, which can be accessed through a web browser

or mobile applications. Google also offers to anyone, whether or not they have a Google

Account, a free web browser called Google Chrome, a free search engine called Google

Search, a free video streaming site called YouTube, a free mapping service called

Google Maps, and a free traffic tracking service called Waze. Many of these free services

offer additional functionality if the user signs into their Google Account.

23.     In addition, Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

24.    Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google Account.

25.    Google advertises its services as "One Account. All of Google working for you." Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public, described in further detail below. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below.

26.    The services requested for the Google subject accounts: investor.dynastytoys@ gmail.com; brettmbartlett@gmail.com; familyfacemasks@ gmail.com; and scott101159@gmail.com are: Gmail, Contacts, Messaging, Google Drive and Keep, Photos, Maps, Location History, Chrome and My Activity, and Google Play.

27.    Gmail - The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, and deleted emails; attachments; the source and destination addresses associated with each email; the size, length, and timestamp of each email; and true and accurate header

information including the actual IP addresses of the sender and recipients of the emails. All forwarding or fetching accounts relating to the accounts.

28. Contacts - Any records pertaining to the user's contacts, including: address books; contact lists; social network links; groups, including Google Groups to which the user belongs or communicates with; user settings; and all associated logs and change history.

29. Messaging - The contents of all text, audio, and video messages associated with the account, including Chat, Duo, Hangouts, Meet, and Messages (including SMS, MMS, and RCS), in any format and however initially transmitted, including, but not limited to: stored, deleted, and draft messages, including attachments and links; the source and destination addresses associated with each communication, including IP addresses; the size, length, and timestamp of each communication; user settings; and all associated logs, including access logs and change history.

30. Google Drive and Keep - The contents of all records associated with the account in Google Drive (including Docs, Sheets, Forms, and Slides) and Google Keep, including: files, folders, media, notes and note titles, lists, applications, and other data uploaded, created, stored, or shared with the account including drafts and deleted records; third-party application data and backups; SMS data and device backups; the creation and change history of each record; accounts with access to or which previously accessed each record; any location, device, other Google service (such as Google Classroom or Google Group), or third party application associated with each record; and all associated logs, including access logs and IP addresses, of each record.

31.     Photos - The contents of all media associated with the account in Google Photos, including: photos, GIFs, videos, animations, collages, icons, or other data uploaded, created, stored, or shared with the account, including drafts and deleted records; accounts with access to or which previously accessed each record; any location, device, or third-party application data associated with each record; and all associated logs of each record, including the creation and change history, access logs, and IP addresses. other Google service (such as Google Classroom or Google Group), or third party application associated with each record; and all associated logs, including access logs and IP addresses, of each record.

32.     Maps - All maps data associated with the account, including Google Maps and Google Trips, including: all saved, starred, and privately labeled locations; search history; routes begun; routes completed; mode of transit used for directions; My Maps data; accounts and identifiers receiving or sending Location Sharing information to the account; changes and edits to public places; and all associated logs, including IP addresses, location data, and timestamps, and change history.

33.     Location History - All Location History and Web & App Activity indicating the location at which the account was active, including the source of the data, date and time, latitude and longitude, estimated accuracy, device and platform, inferences drawn from sensor data (such as whether a user was at rest, walking, biking, or in a car), and associated logs and user settings, including Timeline access logs and change and deletion history.

34.     Chrome and My Activity - All Internet search and browsing history, and application usage history, including Web & App Activity, Voice & Audio History, Google Assistant, and Google Home, including: search queries and clicks, including transcribed or recorded voice queries and Google Assistant responses; browsing history, including application usage; bookmarks; passwords; autofill information; alerts, subscriptions, and other automated searches, including associated notifications and creation dates; user settings; and all associated logs and change history.

35.     Google Play - All activity relating to Google Play, including: downloaded, installed, purchased, used, and deleted applications; details of the associated device and Android ID for each application, medium, or file; payment transactions; user settings; and all associated logs, including IP addresses, timestamps, and change history.

36.     Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Google Hangout, Meet, and Chat conversations pop up within the same browser window as Gmail. Attachments in Gmail are displayed with a button that allows the user to save the attachment directly to Google Drive. If someone shares a document with a Google Account user in Google Docs, the contact information for that individual will be saved in the user's Google Contacts. Google Voice voicemail transcripts and missed call notifications can be sent to a user's Gmail account. And if a user logs into their Google Account on the Chrome browser, their subsequent Chrome browser and

Google Search activity is associated with that Google Account, depending on user settings.

37.     When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

38.     Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

39.     Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

40.     In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

41.     Based on my training and experience, messages, emails, voicemails, photos, videos, documents, and internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.  Thus, stored communications and files connected to a Google Account may provide direct evidence of the offenses under investigation.

42.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time.  As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account.  Such information also allows investigators to understand the

geographic and chronological context of access, use, and events relating to the crime

under investigation.

43.     Account activity may also provide relevant insight into the account

owner's state of mind as it relates to the offenses under investigation.  For example,

information on the account may indicate the owner's motive and intent to commit a

crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt

(e.g., deleting account information in an effort to conceal evidence from law

enforcement).

44.     Other information connected to the use of a Google account may lead to

the discovery of additional evidence.  For example, the apps downloaded from the

Google Play store may reveal services used in furtherance of the crimes under

investigation or services used to communicate with co-conspirators.  In addition,

emails, instant messages, Internet activity, documents, and contact and calendar

information can lead to the identification of co-conspirators and instrumentalities of the

crimes under investigation.

## Conclusion

45.     Based on the forgoing, I request that this Court issue the proposed search

warrant.

46.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer

is not required for the service or execution of this warrant.  The government will

execute this warrant by serving the warrant on Google LLC.  Because the warrant will

be served on Google LLC, who will then compile the requested records at a time

convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

### Request For Sealing

47.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of this Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Further, affiant sayeth not.

s/Eric Thomas_

Eric Thomas
Special Agent
Federal Bureau of Investigation

Attested to by the affiant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on July 21, 2022.

s/Jonathan E. Hawley

JONATHAN E. HAWLEY
United States Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with:

1.      investor.dynastytoys@gmail.com;

2.      brettmbartlett@gmail.com;

3.      familyfacemasks@gmail.com; and

4.      scott101159@gmail.com

that is stored at premises controlled by Google, a company that accepts service of legal

process at 1600 Amphitheatre Parkway, Mountain View, California 94043.

**ATTACHMENT B**

**Particular Things to be Seized**

I.      **Information to be disclosed by Google (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A from May 1, 2015, to the July 21, 2022:

a.      The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

      d.     All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

      e.     All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

      f.     The services requested for the Google subject accounts: investor.dynastytoys@gmail.com; brettmbartlett@gmail.com; familyfacemasks@gmail.com; and scott101159@gmail.com are: Gmail, Contacts, Messaging, Google Drive and Keep, Photos, Maps, Location History, Chrome and My Activity, and Google Play.

## II.     Information to be seized by the government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 1341 (mail fraud), 1343 (wire fraud), and 1344 (bank fraud) committed by BRETT BARTLETT, SCOTT MILLER, and others, and occurring after at least May 1, 2015, and before July 21, 2022, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

    (a)    Fraud by wire, mail, or involving a financial institution, including but not limited to any evidence of a scheme or intent to defraud or false or fraudulent pretenses, representations, or promises

    (b)    Evidence indicating how and when the Accounts were accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

    (c)    Evidence indicating the Account owner's state of mind as it relates to the crime under investigation;

    (d)    The identity of the person(s) who created or used the Account, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant to locate evidence described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

3

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct.  I am employed by Google, and my official title is _____.  I am a custodian of records for Google. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Google, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a.       all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b.       such records were kept in the ordinary course of a regularly conducted business activity of Google; and

c.       such records were made by Google as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____       _____

Date                                          Signature